# United States Court of Appeals
## For the First Circuit

No. 99-1695

UNITED STATES OF AMERICA,

Appellee,

v.

GEORGE VAROUDAKIS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Selya, Circuit Judge,

Lipez, Circuit Judge,

and Casellas,* District Judge.

Diana K. Lloyd, Assistant U.S. Attorney, with whom Donald K. Stern, U.S. Attorney was on brief for appellee.
Kimberly Homan, with whom Sheketoff & Homan was on brief for defendant, appellant.

December 5, 2000

* Of the District of Puerto Rico, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**. This case requires us to decide a familiar but difficult issue about the admissibility of prior bad act evidence under Federal Rules of Evidence 404(b) and 403. The government alleged that defendant George Varoudakis, charged with arson and conspiracy to commit arson in violation of 18 U.S.C. § 844(i) and 18 U.S.C. § 371, hired an acquaintance to burn down his failing restaurant, Destinations, in order to collect insurance proceeds. Following his conviction, Varoudakis argues on appeal that the district court abused its discretion by admitting evidence of a prior bad act, namely, testimony by Varoudakis's long-time girlfriend and co-conspirator in the Destinations arson, Cheryl Britt, that she saw Varoudakis set fire to his leased car sixteen months before the Destinations fire. We agree with Varoudakis that the evidence should have been excluded under Rule 403, and that the error was not harmless. Accordingly, we vacate the judgment.

## I.

We recite the following undisputed facts or describe the testimony of certain witnesses.

In 1991, George Varoudakis opened a restaurant and night club called Destinations at One Congress Street in Boston. The establishment's general manager was Cheryl Britt, Varoudakis's girlfriend since the mid-1980s. Initially,

-2-

Destinations succeeded financially, but business declined about a year after it opened. Varoudakis paid his suppliers cash on delivery and owed his workers back wages. His landlord claimed $600,000 in back rent and damages, and began eviction proceedings in December 1994.

In late 1994, after several years of carrying insurance that was inadequate under the terms of his lease, Varoudakis increased the contents insurance coverage for Destinations to $500,000 and bought business interruption insurance for $100,000. Cheryl Britt testified that Varoudakis told her he increased the insurance so he could burn the restaurant and collect the insurance proceeds.

In January 1995, Varoudakis filed for bankruptcy for One Congress Street, a corporation he controlled that owned Destinations.[1] In February, he filed for Destinations, a separate company. Varoudakis initiated these filings under Chapter 11, allowing reorganization by the debtor-in-possession. In March, he filed for personal bankruptcy. Also in March, the One Congress Street petition was voluntarily converted to Chapter 7, which requires the debtor to transfer control to a

---

[1] Cheryl Britt was listed as the president, treasurer, clerk, and director of Destinations, but testified that she had no financial stake in the company and that Varoudakis controlled it. The defendant did not dispute these facts.

bankruptcy trustee. On April 6, 1995, two days after the fire at Destinations, the Destinations petition was voluntarily converted to Chapter 7.

Britt testified that several weeks before the April 1995 fire, Varoudakis told her to stop paying Destinations's bills. As a result, Britt did not pay the February 1995 insurance bill. On March 27, 1995, the insurance policy was cancelled. At trial, Varoudakis relied on the cancellation to contest the government's theory that he burned Destinations to collect insurance. Britt, however, testified that Varoudakis did not know the insurance was cancelled.

Also sometime in March, Varoudakis began moving sound and lighting equipment from Destinations to a property he owned in Everett. Several employees worked long hours loading the equipment into trucks on the days and nights leading up to the fire. According to Britt and others, the removal included a drop-safe, tables, kitchen equipment, liquor, and paperwork. More than $100,000 worth of equipment was removed.

Britt and her sister, Diane Casey, testified that at the end of March 1995, Varoudakis hired Casey's boyfriend, Nick Adams, to torch Destinations. Britt said that Varoudakis told her to pay Adams $2,000 when the job was completed.

On the night of April 3, Varoudakis went to the Foxwoods Casino with two friends. Britt and Casey testified that he instructed Casey to switch shifts with Destinations's scheduled night manager, Mansour Alrisheq, on the night of April 3 because Alrisheq did not know of the planned arson. Casey also said Varoudakis told her to give Adams the keys to Destinations.

Destinations burned on April 4, 1995. Investigators determined that arson caused the fire. Varoudakis did not dispute this finding at trial.

In the early morning of April 4, apparently believing he had insurance, Varoudakis called his insurance agent from Foxwoods to report the fire. Britt testified that when Varoudakis learned that the fire damage to Destinations was not extensive, he was furious with Adams for having botched the job.

When interviewed about the fire in September 1995, Varoudakis, who was not then a suspect, told investigators that the fire might have been connected with the robbery of the Destinations drop-safe, which held between $5,000 and $7,000, and that a rival Greek club might be responsible. He also mentioned Casey and Adams as suspects.

Cheryl Britt initially denied to investigators that Varoudakis had hired Adams to set the fire. After she learned

that Varoudakis had accused Casey and Adams, and after investigators told her she could be indicted, she implicated Varoudakis. In the course of these discussions with investigators in October 1995, Britt was promised immunity. However, she lied about her involvement in the fire and her relationship with Varoudakis to investigators and in two grand jury appearances. The government did not revoke her immunity. At Varoudakis's trial, Britt was one of the government's main witnesses.

On February 10, 1999, after a thirteen-day trial, a jury convicted Varoudakis of both arson and conspiracy to commit arson. At the end of the second half-day of deliberations, the jury wrote the court a note saying: "At this current time, we are at an impasse. Could you tell us how to proceed." The court told the jury to stop for the day and continue on the following day. After another day and a half of deliberations, the jury found Varoudakis guilty.

## II.

At trial, the court allowed Cheryl Britt to testify that in December 1993 she saw Varoudakis set fire to a Cadillac he had leased. Britt said that Varoudakis parked the car on a piece of property he owned in Everett and that he left in another car to buy gasoline, with her as a passenger. When he

returned, he threw newspapers into the back of the Cadillac, poured gasoline over them, and ignited the newspapers. Britt said Varoudakis told her that he torched the car because the lease had expired and he owed excess mileage charges, and that he expected insurance to cover the loss. On cross-examination of Britt, Varoudakis offered the car lease agreement to impeach Britt's testimony that the lease had expired. The agreement showed that the lease had 23 months remaining.[2] Following Britt's testimony, Officer Richard Gamby of the Everett Police Department testified that he investigated the burning of a Cadillac in December 1993 that matched Britt's description.

Varoudakis argues that the car fire evidence should not have been admitted under Rule 404(b) because its sole purpose was to demonstrate criminal propensity, or that the evidence should not have been admitted under Rule 403 because its probative value was substantially outweighed by its unfairly prejudicial effect. The government responds that the car fire evidence was properly admitted, or, if not, that its admission was harmless error.

---

[2] The lease showed that Varoudakis had leased the car for 36 months, and that at the time of the fire he had used 13 months of that period. The lease allowed him to drive 45,000 miles without further charge. There was no evidence of what the mileage was at the time of the fire. The defense argued that it was unlikely that Varoudakis would have driven 45,000 miles in 13 months.

We review the district court's determination that the prior bad act evidence was admissible under 404(b) and 403 for an abuse of discretion.  See United States v. Balsam, 203 F.3d 72, 84 (1st Cir. 2000).

**A. Standard for Admission under Federal Rule of Evidence 404(b)**

Rule 404(b) provides that evidence of a defendant's prior bad acts may not be admitted to prove his criminal character or propensity to commit crimes of the sort for which he is on trial.[3]  To admit evidence of prior bad acts, a trial court must find that the evidence passes two tests.  First, the evidence must have "special relevance" to an issue in the case such as intent or knowledge, and must not include "bad character or propensity as a necessary link in the inferential chain."  United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996).  Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

---

[3] Rule 404(b) provides in relevant part:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Fed. R. Evid. 440(b).

As the text of Rule 404(b) indicates, prior bad act evidence may be specially relevant if, for example, it goes to the defendant's intent, knowledge, plan, absence of mistake, or identity. Additionally, prior bad acts may be admitted in conspiracy cases under 404(b) if they "explain the background, formation, and development of the illegal relationship." United States v. Escobar-De Jesus, 187 F.3d 148, 169 (1st Cir. 1999). See also United States v. Prevatte, 16 F.3d 767, 775-76 (7th Cir. 1994); United States v. Jones, 982 F.2d 380, 382-83 (9th Cir. 1993); United States v. Passarella, 788 F.2d 377, 383-84 (6th Cir. 1986); United States v. Magnano, 543 F.2d 431, 435 (2d Cir. 1976). We have focused on two factors to determine the probative value of prior bad act evidence: "the remoteness in time of the other act and the degree of resemblance to the crime charged." Frankhauser, 80 F.3d at 648, quoting United States v. Fields, 871 F.2d 188, 197 (1st Cir. 1989).

**B. Applying Rule 404(b)**

1. The Court's Ruling

Immediately before the opening statements of counsel, in response to a motion in limine filed by the defendant to exclude the car fire evidence, the court ruled that Britt's testimony about the car fire would be admissible to show Varoudakis's "plan, knowledge, and intent" in relation to

-9-

whether he "knowingly participated in a common scheme to defraud." In support of this rationale, the court cited the government's allegations that Varoudakis committed both the car fire and the Destinations arson "for a financial motive" and with "one of the same conspirators [Britt]."

The court cited United States v. Gonzalez-Sanchez, 825 F.2d 572 (1st Cir.), cert. denied, 484 U.S. 989 (1987), as authority for its ruling. In Gonzalez-Sanchez, the defendants, who were gang members, were convicted of an October 1981 arson. The trial court admitted prior bad act evidence primarily concerning two other recent fires. Like the arson charged, both fires had also destroyed businesses owned by the defendants and insured by the same insurance company. These fires occurred just two months and six months before the October 1981 fire. In upholding the court's decision to admit the evidence, we said: "The issue at trial was not just whether [defendant] Latorre committed arson. The broader issue was whether Latorre knowingly participated in a common scheme to defraud." Id. at 581.

There are important differences between the facts supporting a common scheme rationale in Gonzalez-Sanchez and this case. Unlike the recurring fires in Gonzalez-Sanchez-- three arsons of business properties in six months--Britt's testimony does not suggest a plan connecting the car fire to the

-10-

Destinations fire. In United States v. Lynn, 856 F.2d 430 (1st Cir. 1988), we held that evidence of a prior conviction for marijuana was not admissible to show a common plan or scheme connected to the defendant's instant prosecution for marijuana distribution because there was no evidence that the previous offense "leads in a progression" to the second. Id. at 435. Similarly here, no evidence suggests that "a continuing or connected scheme" linked the car fire and the Destinations fire. Id.

The district court also saw the car fire evidence as specially relevant to the Destinations fire on the ground that Britt acted as Varoudakis's co-conspirator in both instances. The court was correct that prior bad act evidence is admissible to prove conspiracy in cases "where the earlier crime involved the same participants as the charged crime." United States v. Hadfield, 918 F.2d 987, 994 (1st Cir. 1990), citing United States v. Flores-Perez, 849 F.2d 1, 7 (1st Cir. 1988). See also Gonzalez-Sanchez, 825 F.2d at 581 ("the evidence of Latorre's involvement with the same people in past arson and fraud schemes is especially probative of the issue whether he was an innocent 'tool' of others or a knowing participant in the conspiracy").

Britt, however, did not "participate" in the car fire as a co-conspirator. According to her testimony, and there was

-11-

no contrary evidence, she was a witness who went along for the ride. By contrast, she testified that she helped Varoudakis with the Destinations fire, removing restaurant equipment and paying Adams for his work. Her lack of participation in the car fire distinguishes this aspect of the case from <u>Gonzalez-Sanchez</u>, in which the defendant and his fellow gang members played the same roles in committing the prior arsons as they did in the arson for which the defendant was charged.

Finally, the court said that the car fire was specially relevant to Varoudakis's motive to commit the Destinations fire because, in both instances, he allegedly committed arson to alleviate a financial burden by collecting insurance proceeds. Unlike knowledge and intent, motive is not an element of the crime that the government must prove. For that reason, proof of motive must be offered to show some other element, for example, that the crime was committed, the identity of the accused, or the accused's requisite mental state. <u>See</u> 22 Charles A. Wright and & Kenneth A. Graham, Jr., <u>Federal Practice and Procedure</u>, § 5240 (1978).

When prior bad act evidence is offered to prove a motive for the crime, "courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury." <u>Id.</u> That is the problem here. As

proof of motive, the car fire testimony is offered as circumstantial evidence that Varoudakis committed the Destinations fire. It involves an inference of propensity as "a necessary link in the inferential chain." Frankhauser, 80 F.3d at 648. Put most simply, the government argues that Varoudakis's commission of the car fire arson in response to financial stress makes it more likely that he committed the restaurant arson in response to financial stress. Contrast this forbidden inference with the permissible inference to be drawn in a case in which the prior bad act--say, a botched robbery by the defendant that was frustrated by the ineptitude of his cohort--provided the motive for the defendant's subsequent assault on his cohort. There the prior bad act would provide circumstantial evidence of the commission of the assault without the involvement of any propensity inference.

In a case that also involved arson of a restaurant owned by the defendant, the Eleventh Circuit excluded evidence that the defendant, in a separate incident, threatened to "burn out" a tenant after she did not pay a full month's rent. See United States v. Utter, 97 F.3d 509, 514 (11th Cir. 1996) As in this case, the government argued that the tenant's testimony

would show "how the defendant reacts to financial stress." Id.[4] The court rejected this rationale, stating: "This is the type of character and propensity evidence prohibited by Rule 404(b)." Id. See also Lynn, 856 F.2d at 436. For the same reason, we find error in the district court's financial motive rationale.

2. The Britt-Varoudakis Relationship

There is, however, a proper rationale for admitting the car fire evidence under 404(b) that differs subtly, but importantly, from the district court's rationale that Britt was a co-conspirator in both fires. The government urges on appeal that the car fire evidence was properly admitted because it demonstrates the background and formation of the conspiratorial relationship between Varoudakis and Britt during the planning for and commission of the Destinations fire.

In United States v. Escobar-De Jesus, 187 F.3d 148, 169 (1st Cir. 1999), we said that prior bad act evidence is

_____

[4] The court also noted that the prior bad act evidence related "only to [Utter's] threat to use fire" not arson for the purpose of collecting insurance, for which Utter was charged. See Utter, 97 F.3d at 513. As we have noted, Britt testified that Varoudakis set the car fire to collect insurance, and the government offers the testimony to show motive on that basis. However, this distinction between the cases does not affect the relevance to our case of the Utter court's conclusion that the "threat" evidence should have been excluded. In both cases, the prior bad act evidence is specially relevant to the defendant's commission of the crime alleged only if criminal propensity is inferred.

-14-

admissible "to help the jury understand the basis for the co-conspirators' relationship of mutual trust." Id. See also United States v. Love, 134 F.3d 595, 603 (4th Cir. 1998); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); United States v. Diaz, 994 F.2d 393, 395 (7th Cir. 1993). The district court in Escobar-De Jesus admitted evidence about an uncharged heroin deal between the defendant, who was charged with other drug-related crimes, and one of his co-conspirators. We reasoned that the heroin purchase "was relevant and admissible because it helped to explain the history between [co-conspirators] Rodriguez and Escobar," whose relationship "was directly in issue and material to the case." Escobar-De Jesus, 187 F.3d at 169.

Cheryl Britt's relationship with George Varoudakis was similarly material to the conspiracy case against him. Britt testified to the key facts that Varoudakis hired Nick Adams to torch Destinations and that he believed he still had insurance when the arson took place. Britt's testimony also refuted Varoudakis's alibi, and his claim that he removed the sound system and other equipment for a legitimate purpose.

Britt knew these things because Varoudakis trusted her. Her testimony that he allowed her to watch him torch his

Cadillac demonstrated that trust. It also demonstrated Varoudakis's willingness to involve her in some way in his illegal acts. Like the prior bad act evidence admitted in Escobar-De Jesus, Britt's car fire testimony helped explain the nature of their relationship.

The defense argues that the prior bad act evidence should not be admissible to show the background and formation of Britt's relationship with Varoudakis because Varoudakis did not dispute that he and Britt were long-time intimates. At first blush, this argument seems plausible. However, we have held that evidence of prior bad acts may be probative even when it is relevant to an issue that the defendant does not contest. For example, such evidence may be admitted to show knowledge or intent when the defense is a general denial of the charges, see United States v. Oppon, 863 F.2d 141, 146 (1st Cir. 1988), or a claim of mistaken identity, see United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990). After all, the fact that the defendant does not contest the issue for which the prior bad act evidence is offered does not, "by itself, remove those issues from the case." Id.

We conclude, therefore, that the car fire evidence is specially relevant under Rule 404(b) to Varoudakis's relationship with Britt because it shows that he trusted her so

much that he was willing to commit a crime in her presence.[5] We further conclude, however, that the contention that the government did not need the car fire evidence to prove the close relationship between Britt and Varoudakis remains a pertinent question in the Rule 403 analysis, which requires weighing the evidence's probative value against its unfairly prejudicial effect. See United States v. Gilbert, 229 F.3d 15,24 (1st Cir. 2000).

## C. Rule 403

Prior bad act evidence that surmounts the bar of Rule 404(b) may still be inadmissible under Rule 403. This rule requires the trial court to exclude the evidence if its probative value is substantially outweighed by "the danger of unfair prejudice." Fed. R. Evid. 403. Otherwise relevant evidence may also be excluded if its probative value is substantially outweighed by "confusion of the issues, or misleading [of] the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id.

---

[5] Since the car fire took place only sixteen months before the Destinations arson, the two events are also sufficiently proximate in time to warrant admission under 404(b). See Hadfield, 918 F.2d at 994 (convictions that occurred five years before the charged crime were sufficiently proximate in time); Frankhauser, 80 F.3d 641, 649 (seven year span between prior bad act and charged crime did not render evidence inadmissible).

-17-

The district court's determination on this issue merits great deference on appeal. See Hadfield, 918 F.2d at 995. Nonetheless, we find that in this case the district court erred in finding that the car fire evidence was admissible under Rule 403.

Under Rule 403's weighing test, "it is only unfair prejudice which must be avoided." United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989). We stress "unfair" because "[b]y design, all evidence is meant to be prejudicial." Id. Usually, courts use the term "unfair prejudice" for evidence that invites the jury to render a verdict on an improper emotional basis. For example, we have upheld the exclusion of prior bad act evidence in part because it was "undeniably explosive," Gilbert, 229 F.3d at 26. We are also cautious when the prior act is a "shocking or heinous crime likely to inflame the jury." United States v. Mocchia, 681 F.2d 61, 64 (1st Cir. 1982).

As the district court noted, the car fire evidence is not particularly shocking. There is little danger that it swayed the jury toward a conviction on an emotional basis. But Rule 403 also protects defendants from unfair prejudice

resulting from criminal propensity evidence.[6]  As the Supreme Court has stated, improper grounds under Rule 403 "certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged."  Old Chief v. United States, 519 U.S. 172, 180 (1997).

To be sure, all prior bad act evidence involves some potential for an improper propensity inference.  That is why, under Rule 404(b), the possibility that a jury may infer something negative about a defendant's character or propensity to commit crime does not make the evidence inadmissible unless *no* permissible inference may also be drawn.  See Ferrer-Cruz, 899 F.2d at 138. Under Rule 403, however, that risk of an improper criminal propensity inference should be considered in light of the totality of the circumstances, including the government's need for the evidence given other available testimony, to prove the issue identified pursuant to the 404(b) special relevance analysis.  See Old Chief, 519 U.S. at 184 ("what counts as the Rule 403 'probative value' of an item of

---

[6] The drafters of Rule 403 expected "unfair prejudice" to have multiple meanings.  "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, *though not necessarily*, an emotional one." Advisory Committee's Notes on Fed. Rule. Evid. 403, 28 U.S.C.App., at 860 (emphasis added).

evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives").[7]

Here is the crux of our analysis. "The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence." Wright & Graham, supra, § 5214. Doubts about the probative value of prior bad acts evidence are thus "compounded" when prosecutors have other evidence available, "rendering negligible their need to show intent by the prior bad acts." Lynn, 856 F.2d at 436; see also Wright & Graham, supra, § 5250 ("The probative value of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point.").

Our recent holding in Gilbert incorporated the understanding of Rule 403 unfair prejudice that we articulate here. In that case, we affirmed on interlocutory appeal a district court's decision to exclude a variety of prior bad act evidence. We cited as factors the risk that the jury would infer criminal propensity, and the government's lack of need for the evidence. See Gilbert, 229 F.3d at 26 ("we simply do not

---

[7] Rule 401 defines relevant evidence as evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. Rule 401.

see how the jury could regard the [prior bad act] evidence as specially relevant without drawing a forbidden inference of criminal propensity . . . . [W]e do not find particularly compelling the government's argument that it has a strong need for this evidence").

There is clearly a tension between Rules 404(b) and 403. The more similar the prior bad act evidence is to the charged crime, the more likely it is to be deemed relevant under 404(b). Yet the more the prior bad act resembles the crime, the more likely it is that the jury will infer that a defendant who committed the prior bad act would be likely to commit the crime charged. See United States v. Beechum, 582 F.2d 898, 915 n.20 (5th Cir. 1978) ("the more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant"). This is precisely the kind of inference that Rule 403 guards against. See Lynn, 856 F.2d at 436 ("The ordinary inference here would seem very close to the inference the Rule was designed to avoid.").

## D. Applying Rule 403

The government primarily used the car fire evidence to cast Varoudakis as an arsonist. In its opening statement, the government said the following: "Now, the Defendant knew very well how to plan an arson because this wasn't the first arson he

had planned." Although Rule 404(b) permits the admission of prior bad acts evidence as proof of plan, we have already concluded that no common plan or scheme linked the car fire and the Destinations fire. See supra. In reality, this opening statement underscored Varoudakis's criminal propensity to burn Destinations because of the car fire. In questioning Britt about the car fire, the government did not stress the development of her relationship with Varoudakis, a proper rationale for admission under 404(b). Instead, Britt's testimony focused on the facts of the car fire and Varoudakis's statement to her that he burned the car to collect insurance coverage.

Moreover, as in Gilbert, the probative value of the car fire evidence was minimal. The government did not need the car fire to demonstrate the close nature of Varoudakis's relationship with Britt. Britt testified that she and Varoudakis began a romantic relationship in about 1985, and that they lived together for six years, beginning in about 1989, in an apartment that Varoudakis helped Britt purchase. Britt said Varoudakis bought her jewelry and furniture and took her on expensive vacations.

Britt also testified that she allowed him to list her as the president, treasurer, clerk, and director of

-22-

Destinations, a corporation in which she had no financial interest. She said she knew about Varoudakis's long-running dispute over rental payments with the Destinations landlord. Because her name was on the Destinations incorporation papers, she wrote the rent checks. As she said at trial: "Me and George [Varoudakis] [sic] communicated a lot if something came up." Britt also testified that she heard Varoudakis's discussions with a potential buyer for Destinations. She signed the Destinations bankruptcy petition.

The government also did not need the car fire evidence to prove Varoudakis's knowledge or intent relating to the Destinations arson. Varoudakis denied setting the fire at all, rather than arguing that he burned Destinations unknowingly or unintentionally. There was no evidence suggesting that Varoudakis was an innocent "tool" of others in the arson conspiracy like the defendant in Gonzalez-Sanchez, 825 F.2d at 581. The absence of a dispute on these issues weighs against admitting the evidence under 403. See Gilbert, 229 F.3d at 24 (citing as a factor weighing in favor of exclusion that "four of the five issues adduced by the government in support of admitting the [prior bad act] evidence do not appear to be much in dispute in this case."); Lynn, 856 F.2d at 437 n. 15 ("While we do not undermine the government's substantial burden of

proof, we do note that in this instance, 'intent, while technically at issue, [was] not really in dispute,' greatly reducing any need for the jury to know of the previous conviction.") (footnote omitted).

We recognize that our 403 analysis must "evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight." Old Chief, 519 U.S. at 183 n.6. At the start of the trial, the district court denied Varoudakis's motion in limine to exclude the car fire evidence. When the government began to ask Britt about the car fire on direct examination, Varoudakis objected. The court overruled him, relying on its ruling on the motion in limine. The court's decision to allow the evidence at this point followed Britt's other testimony about her close relationship with Varoudakis. Britt had already said that she and Varoudakis had lived together for six years; that she was listed on the Destinations incorporation papers; that she knew about Varoudakis's fight with his landlord; that she wrote the rent checks for Destinations; and that she and Varoudakis "communicated a lot if something came up."[8] This testimony revealed that the government did not need the car fire evidence to establish Britt's close

_____

[8] Other details about Britt's personal relationship with Varoudakis came out during the cross-examination that followed Britt's direct testimony.

-24-

relationship with Varoudakis, the only legitimate purpose of the evidence under 404(b). The absence of any other special relevance under 404(b), including those cited by the court and the government, was also discernible at this juncture. The propensity danger of the evidence was unmistakable. Thus the probative value of the car fire evidence was substantially outweighed by the danger of unfair prejudice at the time the district court admitted it.[9] That ruling was erroneous.

We add two further observations. First, given the nature of appellate review, with its restrictions to the cold record, we rarely reverse a district court's judgment about the admissibility of prior bad act evidence pursuant to the weighing analysis of Rule 403. Indeed, as we have said repeatedly, "[o]nly in exceptional circumstances will we reverse the exercise of a district court's informed discretion vis a vis the relative weighing of probative value and unfairly prejudicial effect." United States v. Griffin, 818 F.2d 97, 101-02 (1st

---

[9] To better position the court to evaluate the government's need for the prior bad act evidence it seeks to offer, the Second Circuit has ruled that the determination about whether to admit the evidence to show knowledge or intent "should await the conclusion of the defendant's case and should be aimed at a specifically identified issue." United States v. Figueroa, 618 F.2d 934, 939 (2d Cir. 1980). We mention this practice because such an ordering of the proof, though not required in this circuit, occasionally may prove to be a useful tool for trial judges.

Cir. 1987). We reiterate our commitment to that principle. Here, however, we have the exceptional case that requires us to intervene.

Second, although we do not reach the conclusion that we must intervene on the basis of hindsight, we do reach it with advantages unavailable to the district court. In ruling on a defendant's motion in limine before trial, courts do not have the benefit of context--how the prior bad act evidence relates to the evidence actually presented by the prosecution during its case in chief. When defendants renew their objection to prior bad act evidence offered by the prosecution during trial, as they usually must to preserve their objection to its admissibility,[10] courts do not have the time we have on appeal to assess critically the 404(b) boilerplate formula for admission of the evidence often invoked by the prosecution.

By contrast, the prosecution does have these advantages of context and time. Before trial, the prosecution

_____

[10] Rule 404(b) requires the prosecution to provide reasonable notice of prior bad act evidence at the defendant's request. See Fed. R. Evid. 404(b). Varoudakis responded to the government's notice by filing a motion in limine to exclude the car fire evidence. He renewed his objection when the government began to question Britt about the car fire at trial, as required. See Gill v. Thomas, 83 F.3d 547, 540-41 (1st Cir. 1996) (party whose in limine motion to exclude evidence is denied must, to preserve issue for appeal, renew objection when evidence is offered at trial).

generally knows the totality of its case and how the prior bad act evidence fits into it. The prosecution also has the time to analyze rigorously whether the exceptions to Rule 404(b),[11] and the limitations of Rule 403, apply to the facts. The failure to engage in that analysis

leads to the needless complications we find in this case and others. See United States v. Rodriguez-Cardona, 924 F.2d 1148, 1153 (1st Cir. 1991) ("[T]he government here attempted to render the rule [of excluding prior bad act evidence] a minor exception. This practice is inconsistent with the fair administration of justice. We notice that this is a recurrent problem.") (footnote omitted); United States v. Simon, 842 F.2d 552, 556 (1st Cir. 1988) (Torruella, J., concurring) ("Almost any excuse or far-fetched theory is made to fit within [Rule 404(b)'s] truly exceptional language.").

In oft-quoted language, Justice Jackson explained why our rules of evidence are so wary of propensity evidence:

---

[11] Because of its many exceptions to the general statement that prior bad act evidence should not be admitted, Rule 404(b) is sometimes understood as one of inclusion, and sometimes as one of exclusion. See Wright & Graham, supra, § 5239. We ourselves have used both formulations. Compare United States v. Rodriguez-Cardona, 924 F.2d 1148, 1153 (1st Cir. 1991) ("Rule 404(b) is a rule of exclusion.") with United States v. Carty, 993 F.2d 1005, 1011 (1st Cir. 1993) ("Rule 404(b) is a rule of inclusion".). Whatever the proper formulation, the exceptions must not swallow the rule.

> The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.

Michelson v. United States, 334 U.S. 469, 475-76 (1948) (footnotes omitted) (quoted approvingly in Old Chief, 519 U.S. at 181). Despite the fairness implications of the prosecution's use of prior bad act evidence, the prosecution too often pushes the limits of admissibility of this evidence, knowing its propensity power and gambling that the time constraints on the trial court, the court's broad discretion, the elasticity of Rule 404(b), and the harmless error rule of the appellate court, will save it from the consequences of overreaching. That is not always a good gamble.

## E. Harmless Error[12]

---

[12] Varoudakis did not ask the district court to give a limiting instruction about the car fire evidence at the time the evidence was offered or before the jury charge, and no instruction was given. When the defendant does not ask for a limiting instruction, but later objects to its absence, we review the district court's failure to issue one sua sponte for plain error. See United States v. Carty, 993 F.2d 1005, 1011 n.9 (1st Cir. 1993). That praxis, however, does not mean that we apply the plain error standard to the court's decision to

Admission of prior bad act evidence is harmless "only if it is 'highly probable' that the error did not contribute to the verdict." United States v. Aguilar-Aranceta, 58 F.3d 796, 802 (1st Cir. 1995). To make this determination, we must conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error." United States v. Williams, 985 F.2d 634, 638 (1st Cir. 1993), quoting United States v. Burke, 948 F.2d 23, 27 (1st Cir. 1991). We cannot so conclude in this case.

The car fire evidence led to testimony by Officer Gamby that bolstered the credibility of Britt, the key government

---

admit prior bad act evidence over the objection of the defendant, even though that evidence would have justified a limiting instruction if the defendant had sought it. Varoudakis did not have to ask for a limiting instruction if he determined that the lack of one operated in his favor. See Malik, 928 F.2d at 23 ("Counsel might well have concluded that, in the context of the trial, such an instruction would not prove very helpful. In any event, whether a party wishes such an instruction, or wishes to forego the instruction (thereby calling less attention to the statement) is primarily a matter for counsel to decide at trial."). Varoudakis did not forfeit his right to challenge admission of the car fire evidence under a harmless error standard by not asking for a limiting instruction. Similarly, contrary to the government's argument, Varoudakis did not forfeit a harmless error argument by not objecting repeatedly to every question or statement of the prosecution about the car fire. Varoudakis renewed his motion in limine objection to the car fire evidence when Britt began to testify about the car fire at the trial. No more was necessary.

witness.[13]  Officer Gamby confirmed Britt's car fire account by testifying that he investigated the burning of a car that matched Britt's description in terms of date, location, and make of vehicle.  In its closing statement, the government said of Britt and her sister Diane Casey: "And when you consider their testimony, consider corroborating evidence . . . evidence that confirms, confirms what they say."  The government then highlighted Gamby's testimony as an example of such corroboration for Britt.  Without the car fire evidence, the government would not have had this opportunity to show an independent, neutral source verifying Britt's truthfulness and accuracy, and thereby enhancing her credibility generally.

In addition, when we "assess the record as a whole," as harmless error analysis requires, United States v. Santana, 175 F.3d 57, 66 (1st Cir. 1999), quoting Morgan v. Hall, 569 F.2d 1161, 1166 (1st Cir. 1978), we cannot say that the government's case was "so overwhelming as to overshadow the prejudicial effect" of the prior bad act evidence.  Santana, 175 F.3d at 67.  As the trial court observed, the government's case

---

[13] Britt alone testified that Varoudakis believed he still had insurance when the arson took place, and that he had no intention of opening a restaurant at the Everett property, and thus had no legitimate reason for removing equipment from Destinations before the fire.  Britt also refuted Varoudakis's alibi by testifying that it was preplanned.  Britt and Casey testified that Varoudakis hired Adams to burn Destinations.

-30-

against Varoudakis would have been largely circumstantial had Britt been discredited.[14]

Finally, the three-day length of the jury deliberations, and the jury's note to the trial court that it was "at an impasse" at the end of the second half-day, weigh against a finding of harmless error. Lengthy deliberations suggest a difficult case. See Santana, 175 F.3d at 67; United States v. Ottersburg, 76 F.3d 137, 140 (7th Cir. 1996) ("The length of the jury's deliberations makes clear that this case was not an easy one."); Gibson v. Clanon, 633 F.2d 851, 855 (9th Cir. 1980) ("The state's case against [the defendants] is a strong one. Nevertheless, if the jury had readily accepted [the] eyewitness testimony it seems unlikely that they would have deliberated for so long to reach a verdict.").

---

[14] The government had shown that Varoudakis suddenly increased his insurance, after years of inadequate coverage, five months before the fire. His phone call to his insurance agent immediately after learning that the fire had occurred apparently demonstrated that he did not know that his failure to pay his bills had interrupted his coverage. Witnesses also testified that Varoudakis directed the removal of hundreds of thousands of dollars worth of equipment from Destinations in the weeks before the fire. The defense, on the other hand, showed that Varoudakis was bankrupt at the time of the arson. It produced witnesses who said the restaurant looked functional when they entered it after the fire. There was also testimony that while the Everett property into which Varoudakis said he moved the Destinations equipment was far from ready to open for business, substantial renovations had begun. Varoudakis himself did not testify at trial.

In some cases, the jury may deliberate for an extended period not because of indecision, but in "a diligent and conscientious attempt to evaluate the evidence, and to verify the testimony of different witnesses and to come to a careful and reasoned decision." Clark v. Moran, 942 F.2d 24, 32-33 (1st Cir. 1991). In this case, however, the jury's "impasse" note reveals uncertainty about Varoudakis's guilt. See Medina v. Barnes, 71 F.3d 363, 369 (10th Cir. 1995) (jurors' indication that they might be unable to reach a unanimous verdict weighed in favor of finding prejudice). The interplay between uncertainty and propensity evidence is particularly troublesome. As then-Judge Breyer put it:

"Although ... 'propensity evidence' is relevant, the risk that a

jury will convict for crimes other than those charged--or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment--creates a prejudicial effect that outweighs ordinary relevance." Moccia, 681 F.2d at 63. That risk occurred here with the admission of the car fire evidence. We cannot deem that admission harmless.[15]

**Judgment vacated. Remanded for further proceedings.**

---

[15] In light of this disposition, we do not reach the two other issues raised by Varoudakis relating to a limit on the cross-examination of Cheryl Britt and to sentencing.

-32-